**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| THE CATHOLIC BENEFITS ASSOCIATION, *et al.* | ) ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | No. 3:23cv-00203-PDW-ARS |
| XAVIER BECERRA, *et al.* | ) ) ) | |
| *Defendants*. | ) ) | |

**COMBINED OPPOSITION TO PLAINTIFFS' PARTIAL MOTION FOR
SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT OF
DEFENDANTS' CROSS-MOTION TO DISMISS PLAINTIFFS' RFRA CLAIMS OR,
IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT ON THOSE CLAIMS**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

STATEMENT OF FACTS ................................................................................... 3

    I.     Title VII's Prohibition on Sex Discrimination and EEOC ...................... 3

    II.    Section 1557 and HHS.................................................................................6

    III.   HHS's Prior Rulemaking Under Section 1557 ...........................................7

         A.    The 2016 Rule and Related Litigation ...................................... 7

         B.    The 2020 Rule and Related Litigation ...................................... 8

         C.    The Religious Sisters of Mercy Proceedings .............................. 9

         D.    The 2024 Rule ......................................................................... 11

    III.   This Litigation..........................................................................................18

STANDARD OF REVIEW ................................................................................ 19

ARGUMENT ...................................................................................................... 19

    I.     The Court Lacks Jurisdiction to Adjudicate Plaintiffs' RFRA Claims.................19

         A.    Plaintiffs Cannot Show Any Non-Speculative, Legally Cognizable Injury.................................................................................. 20

         B.    Plaintiffs' RFRA Claims Are Unripe........................................ 30

         C.    CBA Lacks Associational Standing........................................... 32

    II.    In the Alternative, Defendants Are Entitled to Summary Judgment on Plaintiffs' RFRA Claims....................................................................... 35

    III.   The Court Should Limit Any Relief to Current CBA Members........................... 38

CONCLUSION.................................................................................................... 39

**INTRODUCTION**

Defendants respectfully ask that the Court deny Plaintiffs' motion for partial summary judgment and to dismiss Plaintiffs' Religious Freedom Restoration Act ("RFRA") claims for lack of standing and ripeness. In the alternative, Defendants ask that summary judgment be granted in Defendants' favor on Plaintiffs' RFRA claims. Certainly, some Catholic Benefits Association ("CBA") members may be protected by RFRA, or other laws, from specific enforcement by the Defendants; however, CBA fails to carry its burden to show a pre-enforcement injury and substantial burden on its religious exercise sufficient to justify the relief it seeks—a permanent, blanket exception for all CBA members, current and future, regardless of the facts of a particular matter that might (or might not) arise in the future.

To start, the Court lacks jurisdiction to hear Plaintiffs' pre-enforcement RFRA claims, because neither the named Plaintiffs, nor the CBA's entire membership of nearly 1,500 employers and 7,000 parishes have suffered an injury-in-fact, and because those claims are not ripe. The Section 1557 implementing regulations promulgated by Defendant U.S. Department of Health and Human Services ("HHS") in 2024 ("2024 Rule") expressly provides that compliance with the regulations is not required insofar as application of any requirement would violate applicable Federal protections for religious freedom and conscience. Even more, unlike the 2016 rule that was at issue in *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583 (2022), HHS has made clear that good faith reliance on religious- and conscience-protection statutes immunizes entities from backward-looking relief, even if it is later determined that such protections do not, in fact, apply. As for Defendant Equal Employment Opportunity Commission ("EEOC"), the agency's staff are instructed to take "great care" in situations involving religious employers in order to respect their religious rights and defenses. *See* Compliance Manual on Religious Discrimination § 12-1-C,

EEOC, Directive 915.063 (Jan. 15, 2021) ("EEOC Compliance Manual") (attached as Ex. 1).

The 2024 HHS Rule, moreover, establishes a process by which a recipient can seek assurance ahead of time that it is protected, the determination of which is subject to appeal within the agency, and ultimately to review in Federal district court. EEOC, for its part, in April 2024 implemented enhanced procedures to ensure that employers are aware that they can assert religious defenses at any point in the EEOC's administrative process (including immediately upon receiving a notice of a charge), and to allow those defenses to be resolved before an investigation on the merits of a charge occurs. These new procedures for both agencies, which were added after the Eighth Circuit decided *Religious Sisters of Mercy*, materially distinguish this case from that one. Because Plaintiffs have not shown a credible threat of enforcement that would require any of CBA's many members to perform or provide insurance coverage for the services they object to, Plaintiffs have suffered no injury-in-fact, and their RFRA claims are not ripe, both as a constitutional and prudential matter.

CBA has also failed to show that it has associational standing to assert RFRA claims on behalf of its current members (totaling over 8,500 entities according to the amended complaint) and future members. CBA's RFRA claims "require[] the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). RFRA requires an individualized, fact-specific analysis of the religious beliefs and practices of the claimant, whether the claimant's religious exercise has been substantially burdened, and whether, given the claimant's specific circumstances, the government can "demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430–31 (2006) (citation omitted).

Plaintiffs also cannot demonstrate that their—or any of the CBA members'—religious exercise has been substantially burdened. CBA does not contend that any member is currently engaged in activities in violation of its religious beliefs because of HHS's alleged interpretation of Section 1557 or EEOC's alleged interpretation of Title VII. Nor does CBA contend or provide evidence that either EEOC or HHS has imposed any penalty on any CBA member for acting in accordance with its religious beliefs, or even threatened to do so, or that the EEOC even could do so. Rather, CBA speculates that EEOC or HHS may burden its members' religious exercise at some unspecified time in the future. But that is insufficient to make the required showing that a person's "religious exercise has been burdened," particularly in light of the new procedures both agencies have adopted since *Religious Sisters of Mercy*. 42 U.S.C. § 2000bb-1(c).

## STATEMENT OF FACTS[1]

## I.      Title VII's Prohibition on Sex Discrimination and EEOC

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination "because of . . . sex." 42 U.S.C. § 2000e-2(a)(1). EEOC is tasked with enforcing laws prohibiting unlawful employment discrimination, including sex discrimination, under Title VII. *See generally* 42 U.S.C. § 2000e-5. Employees or job applicants who allege that they have been subject to an unlawful employment practice by an employer subject to Title VII may file a charge with EEOC. *Id.*

---

[1] Pursuant to Local Civil Rule 7.1(A)(3), Defendants submit this Statement of Facts and note that the issues in this case are purely legal and not suitable for trial. Defendants do not contest the sincerity of Plaintiffs' or CBA members' religious beliefs but dispute that Plaintiffs can prevail for the reasons stated herein. Defendants further note that Plaintiffs' Statement of Facts largely consists of legal arguments unrelated to Plaintiffs' RFRA claims, and characterizations of the 2024 Rule, HHS's prior rulemakings, and EEOC guidance documents and court filings. Defendants dispute Plaintiffs' characterizations. However, Defendants do not address Plaintiffs' arguments that pertain to their non-RFRA claims, which are currently stayed. Defendants respectfully refer the Court to the cited documents for a full and accurate statement of their contents, and Defendants discuss them herein only insofar as appropriate to address Plaintiffs' RFRA claims.

3

§ 2000e-5(b). EEOC will then investigate the claim. An employer can raise relevant defenses to a charge, including possible religious defenses, at any time during the investigation; and as explained below, the EEOC enhanced these procedures in April 2024. If, after completing its investigation, EEOC determines that "there is not reasonable cause to believe that the charge is true, it shall dismiss the charge and promptly notify the person claiming to be aggrieved and the [employer] of its action." *Id.* The notice to the employee or applicant is typically referred to as a "notice of right to sue" because the employee or applicant can file suit only after they receive the notice. *Id.* § 2000e-5(f)(1). If, however, EEOC concludes that there is reasonable cause to believe that an employer violated Title VII, it initiates conciliation, a process by which the agency attempts to facilitate a settlement agreement among the charging party, EEOC, and the employer. *Id.* A finding by the EEOC of reasonable cause does not result in any penalty for the employer. If conciliation fails, EEOC "may" bring its own enforcement action against a private employer or issue a right to sue notice allowing the claimant to litigate. *Id.* In either event, the ensuing judicial review is *de novo*. *See Gen. Tel. Co. of Nw., Inc. v. EEOC*, 446 U.S. 318, 325 (1980).

In *Bostock v. Clayton County*, 590 U.S. 655 (2020), the Supreme Court held that Title VII's prohibition on sex discrimination extends to discrimination based on gender identity, explaining that "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex," *id.* at 660. While the EEOC has brought litigation to enforce protections regarding discrimination based on gender identity, it has not brought any litigation regarding the denial of health insurance coverage for gender-affirming care, much less over the religious objections of an employer.[2] The EEOC Compliance Manual states

---

[2] In a recent decision involving health care coverage and the federal government, EEOC found that a federal health plan that excluded coverage for gender affirming care violated Title VII. The

that the "applicability and scope of . . . defenses based on Title VII's interaction with the First Amendment or . . . RFRA[] is an evolving area of the law." Ex. 1 § 12-1-C. The EEOC Compliance Manual further counsels EEOC investigators to "take great care" in situations involving RFRA, directs EEOC personnel to "seek the advice of the EEOC Legal Counsel in such a situation," and notes that "on occasion, the [EEOC] Legal Counsel may consult as needed with the U.S. Department of Justice." *Id.*

More recently, EEOC created enhanced procedures to ensure that employers are aware that they can raise religious defenses at any stage of the EEOC's administrative process (including immediately upon receiving the notice of a charge), request prioritization of such defenses before the investigation of the merits of the charge, and easily inform EEOC of a potential defense via an online portal. *See* Questions and Answers for Respondents on EEOC's Position Statement Procedures Q.2, EEOC (attached as Ex. 2); Enforcement Guidance on Harassment in the Workplace 98–99, EEOC, Directive 915.064 (Apr. 29, 2024) (attached as Ex. 3) (describing the enhanced procedures); *Implementation of the Pregnant Workers Fairness Act*, 89 Fed. Reg 29,096, 29,147–48 & n.245 (Apr. 19, 2024) (same and noting that the enhanced procedure will apply under any of the statutes the EEOC enforces). EEOC's enhanced procedures apply once a charge has been filed; prior to the filing of a charge by the EEOC, which does not provide funding or require any type of certification from employers about their policies, the EEOC has no investigative authority with respect to a given employer.

---

decision noted that this exclusion no longer exists in federal health care programs and that "[a]s the agency is a federal government employer, it does not raise—and this decision does not address—any defense that a religious entity might raise under Section 702(a) of Title VII, the Free Exercise Clause of the First Amendment, or the Religious Freedom Restoration Act. Nothing in this decision is intended to foreclose appropriate consideration of such defenses in any other case." *Lawrence v U.S. Office of Personnel Management,* EEOC Appeal No. 0120162065, 2024 WL 3040129 at n.5 (May 30, 2024).

## II.     Section 1557 and HHS

Section 1557 of the Affordable Care Act states that no individual shall be "excluded from participation in, be denied the benefits of, or be subjected to discrimination under" a federally funded health program or activity on the grounds set forth in several long-standing civil rights laws, including Title IX of the Education Amendments of 1972. 42 U.S.C. § 18116(a) (citing, *e.g.*, 20 U.S.C. § 1681). Among other prohibitions, Section 1557 provides that "an individual shall not [on the basis of sex] be excluded from participation in, be denied the benefits of, or be subjected to discrimination" in health programs or activities that receive federal funds from HHS, that are administered by HHS, or administered by an Affordable Care Act title I entity, such as the Health Insurance Exchanges. 42 U.S.C. § 18116(a); 20 U.S.C. § 1681(a).

Section 1557 also incorporates the "enforcement mechanisms provided for and available under" the civil rights laws it cites. 42 U.S.C. § 18116(a); *see also* 45 C.F.R. § 92.5(a). These enforcement mechanisms permit an enforcing agency—here, HHS and its Office for Civil Rights ("OCR")—to terminate, or refuse to grant, federal funds to entities that discriminate on the basis of sex where voluntary compliance cannot be achieved. *See, e.g.*, 20 U.S.C. § 1682; *see also* 45 C.F.R. §§ 80.6–80.8. But the enforcing agency must take several steps before withholding federal funds. First, it must "advise[] the appropriate person or persons of the failure to comply with the requirement" not to discriminate because of sex and "determine[] that compliance cannot be secured by voluntary means." 20 U.S.C. § 1682. If the party does not voluntarily comply, HHS may withhold funding only after "there has been an express finding on the record, after opportunity for hearing, of a failure to comply." *Id.* The agency then must inform the appropriate congressional committees of the grounds for its action, and any withholding of funding does not take effect until thirty days after the agency provides such notice. *Id.* A party aggrieved by this administrative

process may obtain "judicial review as may otherwise be provided by law." *Id.* § 1683; *see also id.* § 1234g(a) (providing judicial review of funding decision in the court of appeals where recipient located).

## III.    HHS's Prior Rulemaking Under Section 1557

### A.    The 2016 Rule and Related Litigation

In 2016, HHS promulgated a rule implementing Section 1557, which, among other things, prohibits discrimination on the basis of sex in covered health programs or activities. *See Nondiscrimination in Health Programs and Activities*, 81 Fed. Reg. 31,376 (May 18, 2016) ("2016 Rule"). The rule defined sex discrimination to include, as relevant here, gender-identity discrimination. *Id.* at 31,467 (former 42 C.F.R. § 92.4). It provided, for example, that a covered provider could not "deny or limit health services that are ordinarily or exclusively available to individuals of one sex, to a transgender individual based on the fact that the individual's sex assigned at birth, gender identity, or gender otherwise recorded is different from the one to which such health services are ordinarily or exclusively available." *Id.* at 31,471 (former 42 C.F.R. § 92.206).

The rule did not permit enforcement that "would violate applicable Federal statutory protections for religious freedom and conscience," *id.* at 31,466, and it explained that RFRA "is the proper means to evaluate any religious concerns about the application of Section 1557 requirements," *id.* at 31,380. The 2016 Rule stated that HHS would evaluate "individualized and fact specific" RFRA claims "on a case-by-case basis[.]" *Id.* The 2016 Rule's prohibition on gender-identity discrimination was preliminarily enjoined on a nationwide basis later in 2016. *See Franciscan Alliance, Inc. v. Burwell*, 227 F. Supp. 3d 660, 694 (N.D. Tex. 2016). That court also granted summary judgment to the plaintiffs and vacated, as relevant here, the 2016 Rule's

7

prohibition on gender-identity discrimination. *See Franciscan Alliance, Inc. v. Azar*, 414 F. Supp. 3d 928 (N.D. Tex. 2019).

### B.    The 2020 Rule and Related Litigation

In 2019, while parts of the 2016 Rule remained preliminarily enjoined, HHS issued a Notice of Proposed Rulemaking proposing revisions to the 2016 Rule. *See Nondiscrimination in Health and Health Education Programs or Activities*, 84 Fed. Reg. 27,846 (proposed June 14, 2019) ("2019 NPRM"). The 2019 NPRM indicated that HHS intended to repeal the 2016 Rule's definition of discrimination "on the basis of sex" altogether. But the notice also observed that the Supreme Court had granted several petitions for certiorari to determine whether Title VII's bar on sex discrimination included gender identity discrimination. *Id.* at 27,855. HHS acknowledged the likely consequence of the Supreme Court's decision to its own interpretation of Title IX because "Title IX adopts the substantive and legal standards of Title VII[.]" *Id.* Rather than propose a new definition of discrimination "on the basis of sex," HHS indicated it would permit the federal courts to supply the term's "proper legal interpretation." *Id.* at 27,873.

Shortly before the Supreme Court's decision in *Bostock*, HHS released its new rule. *See Nondiscrimination in Health and Health Education Programs or Activities*, 85 Fed. Reg. 37,160 (June 19, 2020) ("2020 Rule"); *see also Fact Sheet: HHS Finalizes ACA Section 1557 Rule* (June 12, 2020), https://www.hhs.gov/sites/default/files/1557-final-rule-factsheet.pdf. Consistent with the 2019 NPRM, the 2020 Rule rescinded the 2016 Rule's definition of "on the basis of sex." *Id.* at 37,167. The 2020 Rule gave no definition for that term but relied on "the plain meaning of the term under Title IX's statutory text." *Id.* at 37,168. The preamble to the 2020 Rule explained that HHS did not believe either Section 1557 or Title IX prohibited gender-identity discrimination. *Id.* at 37,168. The 2020 Rule also expressly incorporated Title IX's existing statutory exemption

8

for educational operations of an entity controlled by religious organizations, in addition to acknowledging that RFRA and any similar laws would apply under Section 1557. *Id.* at 37,204.

The Supreme Court issued its decision in *Bostock* three days after HHS published the 2020 Rule, holding that "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Bostock*, 140 S. Ct. at 1741. Shortly thereafter, several courts concluded that the 2020 Rule likely violated the Administrative Procedure Act because it did not appropriately consider *Bostock* prior to issuance. As relevant here, one district court enjoined the repeal of the 2016 Rule's definition of sex discrimination, but stated that it could not overturn the earlier vacatur of the gender identity language by the *Franciscan Alliance* district court. *See Walker v. Azar*, 480 F. Supp. 3d 417, 427 (E.D.N.Y. 2020). A second district court issued a preliminary injunction enjoining the repeal of "sex stereotyping" language in the 2016 definition of sex discrimination, and further enjoining the 2020 Rule's incorporation of Title IX's statutory exemption for educational institutions controlled by religious organizations. *See Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp. 3d 1, 64–65 (D.D.C. Sept. 2, 2020). Both district courts acknowledged that their orders did not disturb the *Franciscan Alliance* district court's 2019 vacatur of the 2016 Rule's definition of sex discrimination that incorporated gender-identity discrimination. *See Whitman-Walker*, 485 F. Supp. 3d 1, 14 (acknowledging *Franciscan Alliance* vacatur); *Walker*, 480 F. Supp. 3d at 427 (same).

### C.    The *Religious Sisters of Mercy* Proceedings

In *Religious Sisters of Mercy v. Azar*, the plaintiffs—which included CBA—alleged that "[HHS] and, derivatively, [EEOC] interpret Section 1557 and related antidiscrimination laws in a way that compels [plaintiffs] to perform and provide insurance coverage for gender transitions and abortions." 513 F. Supp. 3d 1113, 1122 (D.N.D. 2021). The Court concluded that CBA and the

other named plaintiffs lacked standing to sue HHS because none of the plaintiffs received federal funding, and thus they are not regulated entities under Section 1557. *Id*. at 1136–37 ("Section 1557 does not apply directly to the named [CBA] Plaintiffs. . . . None of the [CBA] Plaintiffs aver that their own health plans receive federal funding. . . . Those Plaintiffs thus lack standing to challenge Section 1557 in their own capacities."). However, the Court concluded that the CBA had associational standing to sue both HHS and the EEOC on behalf of its unnamed members who receive federal funding. *Id.* at 1137, 1141. On the merits, the Court concluded that, "[u]nder the prevailing interpretations of Section 1557 and Title VII," the plaintiffs were entitled to judgment on their RFRA claim that requiring CBA members to "facilitate[] gender transitions through either medical services or insurance coverage" substantially burdened their religious beliefs. *Id. at* 1147– 49. Following the Court's order, the parties in that case jointly moved for entry of final judgment, which the Court entered on February 19, 2021. *Religious Sisters of Mercy v. Azar*, No. 3:16-cv-00386 (D.N.D.), ECF No. 169.

On appeal, the Eighth Circuit reversed the Court's conclusion that the CBA has associational standing to sue on behalf of its unnamed members. *See Religious Sisters of Mercy*, 55 F.4th at 609. The Eighth Circuit explained that the Supreme Court has instructed that "[a] court cannot 'accept[] the organizations' self-descriptions of their membership' because 'the court has an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties.'" *Id.* at 602 (second alteration in original) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)). Thus, "the [Supreme] Court 'require[s] plaintiffs claiming an organizational standing to identify members who have suffered the requisite harm.'" *Id*. (second alteration in original) (quoting *Summers*, 555 U.S. at 499). The Eighth Circuit concluded that the CBA "failed to identify members who have suffered the requisite harm." *Id*. It thus held that "the

CBA lacks associational standing to sue on behalf of unnamed members" as to both Section 1557 and Title VII. *Id.* As to only the named plaintiffs, and not the CBA's members, the Eighth Circuit found standing and concluded that their claims were justiciable and otherwise affirmed the Court's decision. *See id.* at 602–07.

On September 15, 2023, after considering additional briefing from the parties, this Court dismissed the CBA's claims without prejudice. *See Religious Sisters of Mercy v. Azar*, No. 3:16-cv-00386 (D.N.D.), ECF No. 169. The Court issued an amended judgment that did not include relief for the CBA's unnamed members on October 11, 2023. *See Religious Sisters of Mercy v. Azar*, No. 3:16-cv-00386 (D.N.D.), ECF No. 170.

### D. The 2024 Rule

On May 6, 2024, HHS published a Final Rule implementing Section 1557's nondiscrimination requirements. *See* 89 Fed. Reg. 37,522; *see also* 45 C.F.R. § 92.1 ("The purpose of this part is to implement section 1557 of the [ACA] . . . ."). The 2024 Rule provides that "an individual must not, on the basis of race, color, national origin, sex, age, disability, or any combination thereof, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any health program or activity operated by" an entity covered by the Rule. 45 C.F.R. § 92.101(a)(1). "Discrimination on the basis of sex" includes discrimination on the basis of gender identity. *Id.* § 92.101(a)(2)(iv).

In addition to this general nondiscrimination provision, the 2024 Rule includes more specific provisions that describe covered entities' obligations under Section 1557 in more detail. For instance, the Rule requires covered entities to, among other things, "take reasonable steps to provide meaningful access" to their health programs for "individual[s] with limited English proficiency," 45 C.F.R. § 92.201; "ensure that communications with individuals with disabilities

11

. . . are as effective as communications with non-disabled individuals," *id.* § 92.202; and use "patient care decision support tools" in a nondiscriminatory manner, *id.* § 92.210. The Rule also describes more specifically the nondiscrimination requirements to which health insurance issuers and health care providers are subject.

Section 92.207 of the Rule prohibits covered entities that provide or administer health insurance from denying coverage, denying or limiting coverage for a claim, imposing additional cost sharing, or imposing other limitations or restrictions on coverage "on the basis of race, color, national origin, sex, age, disability, or any combination thereof." *Id.* § 92.207(b)(1). Among other specific prohibitions, insurance issuers may not deny coverage to an individual "based upon the individual's sex assigned at birth, gender identity, or gender otherwise recorded"; "implement a categorical coverage exclusion or limitation for all health services related to gender transition or other gender-affirming care"; or otherwise deny coverage "for specific health services related to gender transition or other gender-affirming care if such denial . . . results in discrimination on the basis of sex." *Id.* § 92.207(b)(3)–(5).

Yet § 92.207 makes clear that "[n]othing in th[e] section requires coverage of any health service where the covered entity has a legitimate, nondiscriminatory reason for denying or limiting coverage of the health service or determining that such health service fails to meet applicable coverage requirements, including reasonable medical management techniques such as medical necessity requirements." *Id.* § 92.207(c). For example, "a nondiscriminatory determination that care is not medically necessary based on a patient's anatomy or medical need is permissible." 89 Fed. Reg. at 37,607. A denial decision, however, cannot "be based on unlawful animus or bias, or constitute a pretext for discrimination." 45 C.F.R. § 92.207(c).

Section 92.206 addresses sex discrimination specifically and requires health care providers

to "provide individuals equal access to [their] health programs and activities without discriminating on the basis of sex." *Id.* § 92.206(a). Providers cannot, for instance, deny or limit health services, "including those that have been typically or exclusively provided to, or associated with, individuals of one sex," based on a patient's "sex assigned at birth, gender identity, or gender otherwise recorded." *Id.* § 92.206(b)(1). Nor can they "treat[] individuals differently or separat[e] them on the basis of sex in a manner that subjects any individual to more than de minimis harm." *Id.* § 92.206(b)(3); *see also* 89 Fed. Reg. at 37,593 (clarifying that the Rule does not prohibit "a covered entity from operating sex separated programs and facilities"). And as relevant here, health care providers cannot deny or limit health services sought for the purpose of gender transition or deny or limit other gender-affirming care "that the covered entity would provide to an individual for other purposes if the denial or limitation is based on an individual's sex assigned at birth, gender identity, or gender otherwise recorded." *Id.* § 92.206(b)(4). But the Rule again makes clear that

> [n]othing in [§ 92.206] requires the provision of any health service where the covered entity has a legitimate, nondiscriminatory reason for denying or limiting that service, including where the covered entity typically declines to provide the health service to any individual or where the covered entity reasonably determines that such health service is not clinically appropriate for a particular individual.

*Id.* § 92.206(c). That is, the Rule "does not . . . require a specific standard of care or course of treatment for any individual or otherwise interfere with individualized clinical judgment about the appropriate course of care for a patient." 89 Fed. Reg. at 37,595; *see id.* at 37,596 (underscoring that the Rule does not "compel[] clinicians to provide a service that they do not believe is medically appropriate for a patient"). It simply provides that decisions about care cannot "be based on unlawful animus or bias, or constitute a pretext for discrimination." 45 C.F.R. § 92.206(c).

As relevant to Plaintiffs' RFRA claims, the 2024 Rule expressly recognizes the ability of recipients to rely on Federal religious freedom and conscience protections, including RFRA.

13

Section 92.3(c) provides that "[i]nsofar as the application of any requirement under this part would violate applicable Federal protections for religious freedom and conscience, such application shall not be required." 45 C.F.R. § 92.3(c) (89 Fed. Reg. at 37,693). With respect to abortion specifically, HHS emphasized that "willingness or refusal to provide, pay for, cover, or refer for abortion or to provide or participate in training to provide abortion [ ] is not discrimination under section 1557." 89 Fed. Reg. at 37,576; *see also id.* at 37,535 (discussing 42 U.S.C. § 18023). The 2024 Rule explains that the refusal to offer abortion care could violate Section 1557 if, for example, a provider "refused to provide an abortion to a particular patient because of that patient's race or disability." *Id.* at 37,576. "But a covered provider does not engage in discrimination prohibited by section 1557 if it declines to provide abortions based on religious or conscience objections to performing the procedure," or "for any other nondiscriminatory reasons." *Id.* at 37,576–77.

The 2024 Rule further clarifies that "a recipient may rely on applicable Federal protections for religious freedom and conscience, and application of a particular provision(s) of this part to specific contexts, procedures, or health care services, shall not be required, and does not violate section 1557 if it so relies." 89 Fed. Reg. at 37,659; *see* 45 C.F.R. § 92.302(a) (89 Fed. Reg. at 37,701-02) ("A recipient may rely on applicable Federal protections for religious freedom and conscience, and consistent with § 92.3(c), application of a particular provision(s) of this part to specific contexts, procedures, or health care services shall not be required where such protections apply."). Indeed, the 2024 Rule states: "When a recipient acts based upon its good faith reliance that it is exempt from providing a particular medical service due to the application of relevant religious freedom and conscience protections (*e.g.*, RFRA), [HHS's Office for Civil Rights (OCR)] will not seek backward-looking relief against that recipient even if the recipient had not affirmatively sought assurance of an exemption under § 92.302(b)," and OCR will only "seek

14

forward-looking relief as appropriate under the facts" if it determines after an investigation "that the recipient does not satisfy the legal requirements for an exception." 89 Fed. Reg. at 37,657.

Further, if a recipient seeks assurance that they are exempt, the 2024 Rule sets forth a process by which they can request a written assurance from OCR, at any time, of their religious- or conscience-based exemptions with respect to specific conduct. *See* 45 C.F.R. § 92.302 (89 Fed. Reg. at 37,701-02). Recipients can submit a written notification to the Director of OCR, identifying "[t]he particular provision(s) of this part from which the recipient asserts they are exempt," and the legal and factual basis supporting the exemption. *Id.* § 92.302(b)(1)–(3) (89 Fed. Reg. at 37,702). Upon submitting this notification, the recipient automatically receives a "temporary exemption from administrative investigation and enforcement." *Id.* § 92.302(c) (89 Fed. Reg. at 37,702). "If OCR makes a determination to provide assurance of the recipient's exemption from the application of certain provision(s) of this part or that modified application of certain provision(s) is required," OCR provides a determination in writing, and then "the recipient will be considered exempt from OCR's administrative investigation and enforcement with regard to the application of that provision(s) as applied to the specific contexts, procedures, or health care services provided." *Id.* § 92.302(d) (89 Fed. Reg. at 37,702). If OCR determines that providing the requested assurance of exemption is not justified by the relevant statute, the recipient can appeal this determination within HHS, during which time the temporary exemption will remain in place. Any final adverse decision from the agency would then be subject to judicial review. *Id.* § 92.302(e)-(f) (89 Fed. Reg. at 37,702); *see* 45 C.F.R. pt. 81.

Separately, HHS declined to import the Title IX religious exception into the 2024 Rule, providing a thorough explanation for this decision. *See* 89 Fed. Reg. at 37,530–34. In doing so, HHS clarified that "the decision not to import the title IX religious exception does not compel any

individual provider or covered entity with religious or conscience-based objections to provide abortion or any other care to the extent doing so would conflict with a sincerely-held belief." *Id.* at 37,533. And HHS noted that it "has taken important steps to address religious freedom and conscience protections beyond those in the 2016 Rule," including by adopting § 92.3(c) and § 92.302, and the issuance of a final rule entitled *Safeguarding the Rights of Conscience as Protected by Federal Statutes*, 89 Fed. Reg. 2078 (Jan. 11, 2024). 89 Fed. Reg. at 37,532; *see id.* at 37,533 ("Rather than importing the title IX religious exception into section 1557, . . . the process set forth in § 92.302 respects religious freedom and conscience protections.").

In explaining its decisions in the preamble to the 2024 Rule, HHS repeatedly reiterated its respect for religiously affiliated providers and its goal of protecting their religious freedom: "Religiously affiliated hospitals and health care facilities play a large role in the health care system, and OCR recognizes the critical patient care needs they provide, particularly in reaching underserved communities." 89 Fed. Reg. at 37,658; *see id.* at 37,533 ("OCR appreciates that many religiously affiliated hospitals and providers are providing vital services in areas where people are in the most need and are often motivated by their faith to provide this important care."). HHS explained that "OCR seeks to ensure Federal civil rights protections are fulfilled and has consulted with the appropriate staff regarding the application of religious freedom and conscience protections during this rulemaking and will continue to engage such staff during OCR's enforcement of the final rule." *Id.* at 37,658; *see id.* at 37,533 ("We are committed to affording full effect to Congress's protections of conscience and religion, as detailed in § 92.302 and the Department's issuance of its final rule, Safeguarding the Rights of Conscience as Protected by

Federal Statutes. 89 [Fed. Reg.] 2078.").[3] Indeed, in the single instance where a covered entity asserted a religious exemption to providing gender-affirming care in the context of a complaint filed by a member of the public, OCR immediately paused its investigatory process and found that the recipient was entitled to an exemption from providing that care under RFRA, closing the complaint on that basis. *See* Ex. 4.

Finally, the 2024 Rule provides that HHS may refer claims to the EEOC in certain situations. This referral is based on EEOC being the agency charged by Congress with accepting charges under Title VII and does not indicate anything about how EEOC will handle the referred charge. Specifically, as the 2024 Rule clarifies, the referral from HHS does not mean that the EEOC will find a violation, dictate the type of investigation the EEOC may make, or limit the defenses an employer may raise. *See* 89 Fed. Reg. 37,627 ("This Rule does not determine how or whether any other agency will investigate or enforce any matter referred or transferred by OCR.");

---

[3] Litigants in three cases have obtained stays and/or injunctions prohibiting HHS from enforcing certain provisions of the 2024 Rule. *See Florida v. Dep't of Health & Human Servs.*, --- F. Supp. 3d ----, 2024 WL 3537510, *20-21 (M.D. Fla, July 3, 2024) (staying 45 C.F.R. §§ 92.101(a)(2)(iv), 92.206(b), 92.207(b)(3)–(5), and 42 C.F.R. § 438.3(d)(4), in Florida, and prohibiting HHS from enforcing the interpretation of discrimination on the basis of sex" in 45 C.F.R. § 92.101(a)(2)(iv), 92.206(b), or 92.207(b)(3) in Florida); *Tennessee v. Becerra*, --- F. Supp. 3d ----, 2024 WL 3283887, *14 (S.D. Miss. July 3, 2024) (staying nationwide, to the extent they extend "discrimination on the basis of sex to include gender identity", 42 C.F.R. §§ 438.3, 438.206, 440.262, 460.98, 460.112, and 45 C.F.R. §§ 92.5, 92.6, 92.7, 92.8, 92.9, 92.10, 92.101, 92.206–211, 92.301, 92.303, and 92.304, and enjoining the 2024 Rule "to the extent that the final rule provides that 'sex' discrimination encompasses gender identity"); *Texas v. Becerra*, No. 6:24-cv-211-JDK, ECF No. 41 (E.D. Tex. Aug. 30, 2024) (modifying previous order to stay nationwide 42 C.F.R. § 438.3(d)(4), 438.206(c)(2), 440.262, 460.98(b)(3), and 460.11(a), and 45 C.F.R. 92.101(a)(2), 92.206(b), 92.207(b)(3)–(5). The government has filed notices of appeal in all three cases. Moreover, the provisions upon which the government principally relies here with respect to its jurisdictional arguments, 45 C.F.R. §§ 92.3(c) and 92.302, have not been stayed or enjoined. Title VII's definition of "sex," which was the subject of the Supreme Court's *Bostock* decision, was not directly at issue in those cases.

"OCR will refer the complaint to the EEOC or DOJ for potential investigation"; *id.* at 37,625 (same).

## IV.    This Litigation

Plaintiffs filed this action on October 13, 2023, asserting claims under the Administrative Procedure Act, the First Amendment, the Fifth Amendment, RFRA, and Title VII. On November 22, 2023, Plaintiffs moved for a temporary restraining order and preliminary injunction based on their RFRA claims. ECF No. 3. The Court denied that motion on May 24, 2024, concluding that it was not likely that what Plaintiffs describe as the "Mandate" would be "enforced against the CBA and its members before it is superseded" by the then-recently published 2024 Rule. ECF No. 45 at 3. The Court explained that, despite Plaintiffs' reliance on the Eighth Circuit's decision in *Religious Sisters*, "whether the CBA can establish 'a likely RFRA violation' . . . will depend on the 2024 Rule." *Id.* The Court also noted that, as a practical matter, "the CBA has been outside of the *Religious Sisters* injunction since October 2023, and there are no reports of a serious agency action against the CBA or any of its members." *Id.* at 4.

Plaintiffs filed an amended complaint on May 30, 2024. On July 23, the Court granted the parties' joint motion to stay all of Plaintiffs' claims, except those brought under RFRA. ECF No. 49. Plaintiffs allege that the so-called "Mandate," which Plaintiffs define as HHS's and EEOC's "continuous and coordinated interpretations of Section Title 1557 and Title VII challenged by [their] suit," Am. Compl. ¶ 1, violates RFRA by purportedly requiring CBA members to "facilitate[] gender transition procedures . . . . sterilization procedures . . . procedures intended to procure an abortion . . . and procedures that separate the unitive and procreative nature of a marital union," *id.* ¶¶ 373–76. Plaintiffs further contend that CBA members' religious beliefs "prohibit them from deliberately covering or offering health insurance or other benefits that would cover or

facilitate services related to gender transition, sterilization, abortion, and certain infertility treatments." *Id.* ¶¶ 389. Plaintiffs moved for partial summary judgment on their RFRA claims on August 1, 2024. ECF No. 51.

## STANDARD OF REVIEW

Defendants move to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure Plaintiffs' RFRA claims because Plaintiffs lack standing to assert those claims. To withstand a motion to dismiss under Rule 12(b)(1), the plaintiff bears the burden of establishing that the court possesses subject matter jurisdiction over its claim. *See Herden v. United States*, 726. F.3d 1042, 1046 (8th Cir. 2013) (en banc). Courts must keep in mind that "[f]ederal courts are of limited jurisdiction," *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994), and should "presume that [they] lack jurisdiction unless the contrary appears affirmatively from the record," *Nat'l Right to Life Pol. Action Comm. v. Connor*, 323 F.3d 684, 689 (8th Cir. 2003) (citing *Renne v. Geary*, 501 U.S. 312, 316 (1991)).

In the alternative, Defendants cross-move for summary judgment on Plaintiffs' RFRA claims. Rule 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is 'genuine' if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party." *Schilf v. Eli Lilly & Co.*, 687 F.3d 947, 948 (8th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A fact is material if it 'might affect the outcome of the suit.'" *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting *Anderson*, 477 U.S. at 248).

## ARGUMENT

**I.    The Court Lacks Jurisdiction to Adjudicate Plaintiffs' RFRA Claims.**

"'No principle is more fundamental to the judiciary's proper role in our system of

government than the constitutional limitation of federal-court jurisdiction.'" *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976)). "Article III of the Constitution limits the judicial power of the United States to the resolution of 'Cases' and 'Controversies,'" *Hein v. Freedom from Religion Found.*, 551 U.S. 587, 597 (2007); however, "it does not attempt to define those terms." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992). To effectuate the Constitution's mandate, the Supreme Court has developed the doctrine of standing and the similar constitutional prerequisite of ripeness. *Gray v. City of Valley Park, Mo.*, 567 F.3d 976 (8th Cir. 2009). These doctrines often overlap in practice because they "all originate in Article III's 'case' or 'controversy language.'" *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

As discussed below, the Court lacks jurisdiction over Plaintiffs' RFRA claims due to these Article III limitations and the related doctrine of prudential ripeness. Plaintiffs have no cognizable injury from speculative future enforcement of Title VII by EEOC, or of Section 1557 or the 2024 Rule by HHS, and their claims are unripe because any alleged injury is based on hypothetical future enforcement action.

### A.    Plaintiffs Cannot Show Any Non-Speculative, Legally Cognizable Injury.

Article III standing is a jurisdictional prerequisite, and "[t]he party invoking federal jurisdiction bears the burden of establishing" it. *Lujan*, 504 U.S. at 561. The requirement that Plaintiffs have standing encompasses three elements, all of which must be satisfied for each plaintiff and each claim in every lawsuit. *DaimlerChrysler*, 547 U.S. at 352 ("a plaintiff must demonstrate standing for each claim . . . [and] separately for each form of relief sought"); *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) ("Standing is not dispensed in gross"). The "would-be litigant must have suffered an injury in fact," which requires the "invasion of a legally protected interest"

in a "concrete and particularized," and "actual or imminent" manner. *Mausolf v. Babbitt*, 85 F.3d 1295, 1301 (8th Cir. 1996) (citation and quotation marks omitted). Next, there must be "a causal connection between the alleged injury and the conduct being challenged." *Id.* Finally, it must be "likely," as opposed to merely speculative, "that the injury will be redressed by a favorable decision." *Id*. Where a plaintiff "seeks declaratory and injunctive relief, past injuries alone are insufficient to establish standing." *Frost v. Sioux City, Iowa*, 920 F.3d 1158, 1162 (8th Cir. 2019). Rather, the plaintiff "must show he is suffering an ongoing injury or faces an immediate threat of injury." *Id.* "In future injury cases, the plaintiff must demonstrate that the threatened injury is certainly impending, or there is a *substantial* risk that the harm will occur. *City of Kennett, Mo. v. Envt. Prot. Agency*, 887 F.3d 424, 431 (8th Cir. 2018) (emphasis added).

**1.** First, as to HHS, the 2024 Rule is explicit that "[i]nsofar as the application of any requirement . . . would violate applicable Federal protections for religious freedom and conscience, such application *shall not be required*." 45 C.F.R. § 92.3(c) (89 Fed. Reg. at 37,693) (emphasis added). The 2024 Rule further clarifies that, "[w]hen a recipient acts based upon its good faith reliance that it is exempt from providing a particular medical service due to the application of relevant religious freedom and conscience protections (*e.g.*, RFRA)," the agency "will not seek backward-looking relief," even if it is later determined that the protection did not apply. 89 Fed. Reg. at 37,657. There is therefore now a clearly stated "'official policy'" of nonenforcement where regulatory requirements would run contrary to RFRA. *Religious Sisters of Mercy*, 513 F. Supp. 3d at 1139 (quoting *Jones v. Jegley*, 947 F.3d 1100, 1004 (8th Cir. 2020)).

Second, the 2024 Rule establishes an administrative process whereby recipients can seek assurances from OCR at any time that RFRA exempts them from "the application of particular provision(s) of this part to specific contexts, procedures, or health care services," although

recipients are not required to do so. 45 C.F.R. § 92.302(b) (89 Fed. Reg. at 37,702). Recipients can seek such assurances even before any administrative complaint is filed and "before an[y] investigation is initiated." *Id.* (89 Fed. Reg. at 37,702). Where recipients avail themselves of this option in advance and obtain an assurance, they will face no threat of investigation or enforcement. *Id.* § 92.302(d) (89 Fed. Reg. at 37,702) ("[I]f granted, the recipient will be considered exempt from OCR's administrative investigation and enforcement . . . ."). If recipients do not seek an assurance in advance, they may still rely on RFRA and, under § 92.3(c) and § 92.302(a), application of the Final Rule's provisions "to specific contexts, procedures, or health care services" of the recipient shall not be required where RFRA protections apply. *Id.* § 92.302(a) (89 Fed. Reg. at 37,701–02). If any administrative complaint is filed regarding their conduct or any investigation is otherwise initiated, the recipient "may, during the pendency of that investigation, similarly notify OCR of their belief they are entitled to an exemption under the process provided at § 92.302(b)." 89 Fed. Reg. at 37,658.

Accordingly, in order for any of CBA's members to potentially be subject to HHS enforcement mechanisms, the following must still occur: (1) the member informs OCR, either by seeking assurance or during the pendency of an investigation, of their belief that they are entitled to an exemption; (2) OCR must deny the assurance request; (3) the member either appeals OCR's denial or voluntarily forgoes its appeal rights; and (3) an HHS administrative hearing examiner must affirm the denial in a final agency action that would still be subject to judicial review, 45 C.F.R. § 92.302(e)–(f) (89 Fed Reg. at 37,702).

Third, if the member did not seek an assurance in advance and invoked the § 92.302(b) process after OCR initiated an investigation, OCR will grant a temporary exemption from

administrative investigation and enforcement until a final agency determination is issued on the assurance request. *Id.* § 92.302(c), (e) (89 Fed. Reg. at 37,702).

Finally, even if the assurance were denied and the denial were appealed and affirmed, before a member could be subject to an enforcement action, OCR would still need to proceed with an investigation, evaluate the reasons for the member's conduct, and determine that it does not amount to a legitimate, non-discriminatory reason, that discrimination has occurred, and that Section 1557 was violated; and any efforts at informal, voluntary compliance must fail. There is no indication that this long, speculative series of contingencies—made even longer and less certain by the 2024 Rule—is likely to transpire for any CBA member.

The new assurance process under § 92.302 adds to an already attenuated chain of events that must occur before any CBA member might be injured and weighs heavily against finding that any future injury is sufficiently imminent to give rise to Article III jurisdiction, and further distinguishes this case from *Religious Sisters of Mercy*. Although this Court and the Eighth Circuit concluded in that case that there was a sufficiently credible threat of enforcement prior to the issuance of the 2024 Rule, now, given the 2024 Rule's clear statement that compliance with the agency's Section 1557 regulations "shall not be required" insofar as application of those regulations would conflict with Federal protections for religious freedom and conscience, the agency's commitment not to seek backward-looking penalties if the recipient relied in good faith on religious- or conscience-protection statutes, and the 2024 Rule's new assurance process, no credible threat exists. *See Iowa Right to Life Comm., Inc. v. Tooker*, 717 F.3d 576, 585–87 (8th Cir. 2013) (holding that plaintiff lacked standing to bring a First Amendment challenge where defendant had not threatened to enforce the challenged provisions against plaintiff and the challenged policy did not compel any actions by plaintiff); *R.K. ex rel. J.K. v. Lee*, 53 F.4th 995,

999 (6th Cir. 2022) (relying on the existence of an accommodation process and "plaintiffs' failure to test the practical effect of the Act by seeking an accommodation" in concluding that plaintiffs lacked standing), *reh'g denied*, No. 22-5004, 2022 WL 18434486 (6th Cir. Dec. 28, 2022).

Nor can it even be said that the 2024 Rule "arguably proscribe[s]" CBA members' refusal to perform or cover gender-affirming care or fertility treatments to which they object, so long as that refusal is protected by Federal protections for religious freedom and conscience. *See Religious Sisters of Mercy*, 513 F. Supp. 3d at 1138 (quoting *Driehaus*, 573 U.S. at 162). And, with respect to abortion, the 2024 Rule is explicit that refusing to "provide pay for, cover, or refer for abortion or to provide or participate in training to provide abortion [ ] is not discrimination under section 1557." 89 Fed. Reg. at 37,576. The Court should therefore reject Plaintiffs' attempt to shoehorn the facts of this case into *Religious Sisters of Mercy*. *See* Pls.' Mem. in Supp. of Mot. for Summ. J. 32–33, ECF No. 51 ("Pls.' Mem.").

Plaintiffs attempt to brush aside the clear exemption from compliance in § 92.3(c) when Federal religious or conscience protections apply. *See* Pls.' Mem. at 17–18. But the 2024 Rule is explicit that, if a recipient's conduct falls within the scope of a Federal religious or conscience protection statute, the requirements of the 2024 Rule do not apply. *See* 45 C.F.R. § 92.3(c).[4]

---

[4] Although Plaintiffs argue repeatedly that it was contrary to law for HHS not to incorporate Title IX's statutory exemption for educational institutions controlled by religious organizations, *see, e.g.*, Pls.' Mem. at 18, Plaintiffs' Administrative Procedure Act claims are currently stayed, and Plaintiffs must establish standing for their RFRA claims independently. *DaimlerChrysler*, 547 U.S. at 352. Plaintiffs also state that Title VII contains "a religious exemption" that they claim is "categorical." Pls.' Mem at 2, 21 n.3. But as the Fourth Circuit recently recognized, "[n]o federal appellate court in the country has embraced the . . . argument that Title VII permits religiously motivated sex discrimination by religious organizations." *Billard v. Charlotte Catholic High School*, 101 F.4th 316, 328 (4th Cir. 2024); *see also Religious Sisters of Mercy*, 513 F. Supp. 3d at 1141 n.10 (noting that "[m]ost courts deem [the religious employer exemption in Title VII] inapplicable to a religious organization charged with discrimination on the basis of sex" (quotation omitted)).

Plaintiffs also question the effectiveness of the assurance process, which they say is inadequate because it is HHS, through OCR, that will evaluate whether to grant an assurance in the first instance. *See* Pls.' Mem. at 19–20. Yet, of course, it is HHS that created the assurance process in the first place, and there is no reasonable basis to speculate that the agency will not evaluate an assurance request in good faith. Indeed, in the single instance where a covered entity asserted a religious exemption to providing gender-affirming care in the context of a complaint filed by a member of the public, OCR immediately paused its investigatory process and found that the recipient was entitled to an exemption from providing that care under RFRA, closing the complaint on that basis. *See* Ex. 4.

Plaintiffs' argument also ignores the procedural protections that the 2024 Rule creates when an assurance is requested, which include appeal rights within HHS and the opportunity to seek judicial review in the event of a final adverse decision from the agency. 45 C.F.R. § 92.302(e)-(f) (89 Fed. Reg. at 37,702); *see* 45 C.F.R. pt. 81. Finally, it is not accurate, as Plaintiffs suggest, that CBA members would not be eligible for Federal religious or conscience protections, in HHS's view, if the entity requesting assurance failed to "provide evidence that it has never performed the objectionable procedure." Pls.' Mem. at 19 (citing 89 Fed. Reg. at 37,657). That assertion mischaracterizes the cited portion of the 2024 Rule, which only provides an example of information that could be included in an assurance request, including "evidence that [the entity] never provides sterilization *in violation of a particular religious or conscience belief for any patient*, no matter their sex." 89 Fed. Reg. at 37,657 (emphasis added).

**2.** As to EEOC and Title VII, the government acknowledges that this Court previously concluded in *Religious Sisters of Mercy* that CBA's members had standing to pursue RFRA claims regarding gender affirming care and Title VII, and that the Eighth Circuit affirmed that conclusion.

However, whether an employer would ever face consequences resulting from EEOC's interpretation depends on the acts of third parties—employees who would file a charge. And the Supreme Court recently cautioned against "standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013)). This caution is especially apt where, as here, the Court would have to guess as to the actions of employees of entities that are currently not members of CBA.

Here, moreover, the chain of events that would need to occur before any CBA member could face litigation by EEOC is too long and speculative to present an injury-in-fact: (1) an employee of a CBA member would have to be transgender; (2) would not have already had gender-affirming care and would now decide to undertake gender-affirming care; (3) notwithstanding their employment in at a Catholic-affiliated employer, would seek health insurance coverage from their employer for such care; (4) the employee, after being denied such coverage must file a charge with the EEOC;[5] (5) the EEOC must reject all of the employer's potential defenses, including those based on religious reasons; (6) the EEOC must conclude that reasonable cause exists to believe a violation occurred; (7) the EEOC must fail to resolve the matter through conciliation, and (8) EEOC would have to decide to bring suit.[6] And even then, the employer would be entitled to its defenses being reviewed *de novo* by a court. Thus, any finding of liability, award of damages, or

---

[5] An individual could also file a claim with HHS and, in certain circumstances, HHS would refer the charge to the EEOC. As HHS's 2024 Rule clarifies, this "referral" does not mean that the EEOC is obligated to find a violation. *See* 89 Fed. Reg. 37,627 ("This Rule does not determine how or whether any other agency will investigate or enforce any matter referred or transferred by OCR."); *see also id.* at 37,625 ("OCR will refer the complaint to the EEOC or DOJ for potential investigation.").

[6] To the extent Plaintiffs' claims against the EEOC include being required to provide health insurance coverage for abortion or fertility treatments over their religious objections, those claims fail as a matter of law. *See infra* at 29.

equitable remedy imposed on an employer would only occur if *a court,* not the agency, disagreed with the employer's defenses. Contrary to CBA's argument, an investigation by the EEOC (what CBA calls "administrative enforcement" Pls.' Mem. at 8) does not result in any damages or relief against an employer. Such relief could occur only in a suit brought by the EEOC if a court disagreed with the employer's claimed defenses. Moreover, a reasonable cause finding by the EEOC after an investigation, or even a litigated judgment in a case brought by the EEOC, has no effect on federal funding for an organization because the EEOC does not provide federal funding, and EEOC does not have the authority on its own or after a ligated judgment to assess fines against an employer for employment discrimination.

Moreover, as discussed above, since the *Religious Sisters of Mercy* decision, EEOC has implemented enhanced procedures to make employers aware of their ability to raise religious defenses at any stage of the EEOC process (including immediately upon receiving notice of the charge), request prioritized consideration of such defenses before the investigation of the merits of the charge, and "easily inform [EEOC] of a potential defense" via an online portal. Ex. 3 at 98; 89 Fed. Reg. 29,147–48. These procedures are consistent with EEOC's instruction in its Compliance Manual that EEOC investigators should "take great care" in situations involving RFRA. That Manual directs EEOC personnel to "seek the advice of EEOC Legal Counsel in such a situation," and notes that "on occasion [EEOC] Legal Counsel may consult as needed with the U.S. Department of Justice." Ex. 1 § 12-1-C.

Indeed, EEOC has never filed an enforcement action in court against any employer, much less an employer asserting religious objections, for not offering health care coverage for gender-affirming care, undermining any claim that CBA's members face a credible threat of enforcement. Plaintiffs point to one instance in which EEOC requested information from an entity that—

27

unknown to EEOC at the time—was a CBA member and the charge at issue involved insurance coverage for gender-affirming care. *See* Pls.' Mem. at 25-26. However, Plaintiffs' description of the events as an attempt to "enforce" a specific view of Title VII is inaccurate. Pls.' Mem. at 25. When an individual files a charge of discrimination against an employer, Title VII requires EEOC to notify the employer of the charge and to initiate an investigation. *See* 42 U.S.C. § 20003-5(b) ("Whenever a charge is filed . . . [EEOC] *shall* serve a notice of the charge . . . on such employer [] . . . within ten days, and shall make an investigation thereof." (emphasis added)).[7] Accordingly, Plaintiffs' allegations show only that EEOC complied with its statutory obligations concerning the administrative process. EEOC engaging in this statutorily required administrative process is very different from EEOC deciding to exercise its enforcement discretion to pursue a litigation in court against an employer. EEOC's administrative process is not an enforcement action at all, as EEOC does not adjudicate the claim and has no authority to impose penalties on employers itself. *Fort Bend County v. Davis*, 587 U.S. 541, 544–45 (2019) (alterations omitted); *see also Occidental Life Ins. Co. of Cal. v. EEOC*, 432 U.S. 355, 363 (1977); 42 U.S.C. § 2000e-5(f)(1).

Moreover, CBA has acknowledged that, once EEOC was informed that the employer was a CBA member, EEOC did not take any further action in light of the *Religious Sisters of Mercy* injunction. And even if no injunction had been in place, an employer can always respond to a charge of discrimination by invoking a RFRA defense. If EEOC were to conclude that the

---

[7] EEOC cannot respond to Plaintiffs' allegations in further detail, as Title VII's confidentiality provision precludes EEOC from providing information regarding any charge prior to suit. *See* 42 U.S.C. § 2000e-8(e) (making it unlawful "to make public in any manner whatever any information obtained by [EEOC] pursuant to its authority under this section prior to the institution of any proceeding"); 29 C.F.R. § 1601.22 ("Neither a charge, nor information obtained during the investigation of a charge of employment discrimination under title VII . . . shall be made matters of public information by [EEOC] prior to the institution of any proceeding under title VII[.]").

employer raised a valid RFRA defense, EEOC would not take any further action against the employer and would not file an enforcement action. *See also Newsome v. EEOC*, 301 F.3d 227, 229–30 (5th Cir. 2002) (dismissing charge where employer asserted religious organization exemption applied).

CBA's claims that its members face a credible threat of enforcement from the EEOC with regard to health insurance coverage for abortions or for fertility treatments are equally unavailing. As to abortion, Title VII itself provides "[t]his subsection shall not require an employer to pay for health insurance benefits for abortion, except where the life of the mother would be endangered if the fetus were carried to term, or except where medical complications have arisen from an abortion." 42 U.S.C. 2000e(k). Thus, nothing in Title VII could require an employer to provide health insurance coverage for an abortion, absent certain circumstances which CBA does not allege violate its, or its members', beliefs. *See, e.g.*, Pls.' Mem. at 6.

For fertility treatments, as the EEOC has explained in guidance regarding pregnancy discrimination, "[e]mployment decisions related to infertility treatments implicate Title VII under limited circumstances . . . . with respect to the exclusion of infertility from employer-provided health insurance, courts have generally held that exclusion of all infertility coverage for all employees is gender neutral and does not violate Title VII." Enforcement Guidance on Pregnancy Discrimination and Related Issues § (I)(A)(3)(c), EEOC, Directive 915.003 (June 25, 2015) (attached as Ex. 5). CBA has not alleged that it (or its members') health insurance plans contain the type of exclusions regarding fertility treatments that would be likely to violate Title VII. *See, e.g. Newport News Shipbuiliding and Dry Dock Co. v. EEOC*, 462 U.S. 669 (1983) (finding a Title VII violation where the insurance plan provided fewer pregnancy benefits for the spouses of male employees than for female employees). Moreover, Title VII's provision regarding abortion has

29

been in place since 1978; EEOC's Enforcement Guidance on Pregnancy Discrimination and Related Issues was issued in 2015. Yet CBA has failed to allege facts to substantiate that CBA and its members (and future members) now, in 2024, face any credible threat of enforcement.

### B.    Plaintiffs' RFRA Claims Are Unripe.

For many of the same reasons, Plaintiffs' RFRA claims are also unripe. "The ripeness doctrine is grounded in both the jurisdictional limits of Article III of the Constitution and policy considerations of effective court administration." *Pub. Water Supply Dist. No. 8 v. City of Kearney,* 401 F.3d 930, 932 (8th Cir. 2005). Article III limits the federal courts to deciding "Cases" and "Controversies" and thus prohibits them from issuing advisory opinions. *Id.* "One kind of advisory opinion is an opinion advising what the law would be upon a hypothetical state of facts." *Id.* (internal quotations and citations omitted). A claim is not ripe for adjudication if it rests upon "'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Trump v. New York*, 592 U.S. 125, 131 (2020) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). The constitutional ripeness requirement overlaps with the "injury in fact" requirement of standing. *See Trump*, 592 U.S. at 134; *see also Medimmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 128 n.8 (2007) (recognizing that in some cases, "standing and ripeness boil down to the same question").

Plaintiffs' RFRA claims lack constitutional ripeness for the same reasons that Plaintiffs lack standing. Moreover, even if the Court were to determine that the constitutional ripeness requirements are met, the Court should dismiss Plaintiffs' RFRA claims as prudentially unripe. Prudential ripeness requires courts to consider (1) "the fitness of the issues for judicial decision," and (2) "the hardship to the parties of withholding court consideration." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (citing *Abbott Laboratories. v. Gardner*, 387

U.S. 136, 148–49 (1967)). Under both factors, Plaintiffs' RFRA claims are not ripe.

First, Plaintiffs' RFRA claims are not fit for judicial decision because, in the absence of any enforcement action against the named Plaintiffs or any of CBA's members, the Court lacks any concrete context—including, most basically, who CBA's many members even are—in which to consider whether any particular entity's religious exercise may, in the future, be substantially burdened. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) ("[A] regulation is not ordinarily considered the type of agency action 'ripe' for judicial review under the APA until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him."). Nor is it apparent on the current facts whether the assurance process established by the 2024 Rule, or through EEOC's enhanced procedures, would not provide adequate protection for Plaintiffs to protect their rights, in the event of any future, hypothetical enforcement action, which distinguishes this case from *Religious Sisters of Mercy*.

Withholding court consideration also will impose no hardship on Plaintiffs. There is no reason to believe that either EEOC or HHS would initiate an enforcement action against religious entities that assert a valid religious objection to compliance with specified requirements of either Title VII or the 2024 Rule. There is no evidence of either agency doing so. Moreover, in light of the HHS and EEOC procedures that recognize applicable Federal protections for religious freedom and conscience—*i.e.*, the exemption from the requirements of the 2024 Rule where compliance would violate Federal religious- or conscience-protection statutes, including RFRA, in § 92.3(c); HHS's assurance process; and EEOC's enhanced procedures—it is not the case, as this Court concluded it was in *Religious Sisters of Mercy*, that "Plaintiffs must either alter their policies for

providing and covering gender-transition procedures . . . or risk the loss of critical federal healthcare funding along with potential civil and criminal penalties." 513 F. Supp. 3d at 1147–48. And even if, hypothetically, an enforcement action were ever to be initiated, Plaintiffs or any of the CBA members would be able to raise RFRA as a defense to protect its interests and receive *de novo* review from a court.

### C.    CBA Lacks Associational Standing.

Even if the Court were to conclude that Plaintiffs' RFRA claims meet the requirements of standing and ripeness (which they do not), CBA would still lack standing to sue on behalf of its entire membership of over 8,500 entities. To establish associational standing, an organization must show: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Com'n*, 432 U.S. 333 343 (1977). As discussed below, CBA fails to show that it satisfies the third requirement.

In *Harris v. McRae*, 448 U.S. 297 (1980), the Supreme Court held that an organization lacked associational standing to bring a First Amendment free exercise claim against HHS's predecessor because the participation of individual members was required. The Court explained that "[s]ince 'it is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion,' . . . the claim asserted here is one that ordinarily requires individual participation." *Id.* at 321 (internal citation and footnote omitted). Other courts have similarly rejected associational standing for free exercise claims based on the necessity of individual participation. *See Cornerstone Christian Sch. v. Univ. Interscholastic League*, 563 F.3d 127, 134 (5th Cir. 2009) ("*Harris* precludes Cornerstone's

standing to bring the free exercise claim in this case. The involvement of parents and students . . . is essential to the resolution of the individualized element of coercion within this free exercise claim."); *Soc'y of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1288 (5th Cir. 1992) ("[I]t appears likely that the Society's claim would require the participation of individual members. It is often difficult for religious organizations to assert free exercise claims on behalf of their members[.]" (citing *Harris*, 448 U.S. at 320).

The same reasoning applies to RFRA claims. As the Supreme Court has explained, Congress enacted RFRA to codify the standard that governed free exercise claims before *Employment Division v. Smith. See City of Boerne v. Flores*, 521 U.S. 507, 512–16 (1997). RFRA provides that the "Government shall not substantially burden a person's exercise of religion," unless the government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1. RFRA requires individual consideration of the claimant's religious beliefs, whether the application of a law to the claimant substantially burdens the claimant's exercise of religion, and whether, given the claimant's specific circumstances, the government can "demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *O Centro*, 546 U.S. at 430–31. The "to the person" analysis required by RFRA is incompatible with blanket application of RFRA to the entire membership of an organization without the individual members' participation.

CBA asserts that individual member participation is not required because, according to Plaintiffs, all CBA members adhere to the same religious teachings. *See, e.g.*, Pls.' Mem. at 36–37. However, even if the Court accepted CBA's assertion that all 8,500 of its members (and any

future members) have identical religious beliefs regarding gender-affirming care and fertility treatments,[8] the Court would still need to consider whether each member acts on those religious beliefs in such a way that a purported requirement to provide insurance coverage for or perform such services would "substantially burden" each member's "exercise of religion." 42 U.S.C. § 2000bb-1(a).

Moreover, even if each member had established a substantial burden on religious exercise, the Court would still need to consider whether, given each member's individual circumstances, imposing such a burden was "the least restrictive means of furthering" a "compelling governmental interest." *Id.* § 2000bb-1(b). That test demands a fact-specific application of the challenged law, *O Centro*, 546 U.S. at 430, which cannot be conducted on the whole for CBA's thousands of unnamed members. *Cf. Ramirez v. Collier*, 595 U.S. 411, 433 (2022) (holding that the Religious Land Use and Institutionalized Persons Act, which applies RFRA's test in the prison setting, "requires that courts take cases one at a time, considering only the particular claimant whose sincere exercise of religion is being substantially burdened") (quotation omitted).

Defendants recognize the Court's conclusion in *Religious Sisters of Mercy* that CBA satisfied the third requirement for associational standing, that neither the claim asserted nor the relief requested required the participation of individual members. *See* 513 F. Supp. 3d at 1137 (citing *Heartland Acad. Cmty. Church v. Waddle*, 427 F.3d 525, 533 (8th Cir. 2005)). Yet, in that case, Defendants raised arguments only with respect to the first prong of the associational standing

---

[8] Plaintiffs also argue that all CBA members' religious exercise is substantially burdened because the 2024 Rule "exten[ds] to abortion." Pls.' Mem. at 29. However, as discussed above, the 2024 Rule is clear that "willingness or refusal to provide, pay for, cover, or refer for abortion or to provide or participate in training to provide abortion [ ] is not discrimination under section 1557," (89 Fed. Reg. at 37,576; *see also supra* at 14), and Title VII itself does not require health insurance coverage for abortion absent very specific circumstances that Plaintiffs do not challenge. 42 U.S.C. 2000e(k).

test. *See Religious Sisters of Mercy v. Azar*, No. 3:16-cv-00386 (D.N.D.), ECF No. 113. The Court did not have the opportunity to consider Defendants' argument raised here that—unlike the claims in *Heartland Academy*, which were brough under the Fourth Amendment, *see* 427 F.3d at 528–29, 533—individual participation is required under RFRA.[9]

## II.    In the Alternative, Defendants Are Entitled to Summary Judgment on Plaintiffs' RFRA Claims.

Plaintiffs cannot prevail on the merits of their RFRA claims because they cannot show that CBA's current members' religious exercise has been "substantially burden[ed]." 42 U.S.C. § 2000bb-1(a). "Substantially burdening one's free exercise of religion means that the regulation must significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion." *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008).

Plaintiffs do not contend or provide evidence that any of CBA's members, because of the 2024 Rule or Title VII, currently are violating their religious convictions by offering insurance coverage or performing the services to which they object. Nor do Plaintiffs provide any evidence that EEOC or HHS has taken any action against any of CBA's members to impose any adverse consequences on them (or, for that matter, any other religious employer or healthcare provider) under Section 1557 or Title VII. In fact, EEOC has never filed an enforcement action in court against any employer, much less an employer asserting religious objections, for not offering health care coverage for gender-affirming care, fertility treatments, or abortion. And HHS granted a

---

[9] Plaintiffs' hurdles are even greater for future, unnamed entities that have not even joined CBA and for whose interests Plaintiffs lack standing to represent. *See infra* Part III.

religious exemption in the only instance the Department has ever experienced where a covered entity asserted a religious defense to the provision of gender-affirming care. *See* Ex. 4.

Indeed, both EEOC and HHS have made clear that they operate in compliance with RFRA when enforcing Title VII and Section 1557, respectively, as discussed above. EEOC's Compliance Manual directs EEOC investigators to "take great care" in situations involving RFRA, and its enhanced procedures ensure that employers are aware that that they can raise religious defenses at any point in the charge process and have them resolved prior to other issues being investigated. HHS, for its part, has repeatedly reaffirmed across three presidential administrations (including the current administration) that it complies with RFRA when enforcing Section 1557. *See supra* Statement of Facts, Part III. And, in the 2024 Rule, HHS made clear that compliance with its Section 1557 regulations "shall not be required," if a Federal religious- or conscience-protection statute applies, and created a process for recipients to seek advance assurance from HHS if they so choose, which provides an automatic "temporary exemption from administrative investigation and enforcement" while OCR considers the assurance request. 45 C.F.R. § 92.302(c) (89 Fed. Reg. at 37,702).

Absent any plausible argument that EEOC or HHS are either preventing the named Plaintiffs or CBA's current and future members from exercising their religion or penalizing them for doing so, Plaintiffs essentially argue that they, and CBA's current and future members, face a substantial burden from some unspecified agency enforcement action at some unspecified time in the future. Such speculation of future burden, however, is insufficient to show that any of the named plaintiffs or the entire membership of CBA's "religious exercise has been burdened in violation of" RFRA, 42 U.S.C. § 2000bb-1(c), as necessary to support relief under the statute. And any claim regarding the allegedly substantial burden on the religious exercise of *future* CBA

members is even more speculative, given that CBA does not know who those hypothetical members are or what may substantially burden their religious exercise.

Because Plaintiffs fail to show a substantial burden, it is unnecessary for the Court to address whether the imposition of a substantial burden would be the least restrictive means of furthering compelling government interests. However, even assuming a substantial burden, Plaintiffs still could not obtain a blanket injunction from pre-enforcement relief for all of CBA's many members without demonstrating that the government will *never* have a compelling interest in preventing discrimination as prohibited by Section 1557 or discrimination on the basis of "sex" under Title VII.

Indeed, as to EEOC, Plaintiffs suggestion that Title VII could *never* satisfy a compelling governmental interest is contrary to *Bostock*, in which the Court suggested that RFRA "might supersede Title VII's commands *in appropriate* cases," but did not suggest it would in every case. 590 U.S. at 682 (emphasis added). Instead, courts must be "mindful of the potential for abuse" by "use of the First Amendment as a pretextual shield to protect otherwise prohibited employment decisions." *Scharon v. St. Luke's Episcopal Presbyterian Hosps.*, 929 F.2d 360, 363 n.3 (8th Cir. 1991). Thus, courts must consider "on a case-by-case basis" whether "a plaintiff's employment discrimination claim can be adjudicated without entangling the court in matters of religion," *id.*, which is antithetical to a blanket exemption, *see Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914 938 (2023) (agreeing with "the inapplicability of deciding RFRA claims class-wide"). To be sure, "the government's compelling interest in purportedly eradicating sex discrimination [is not] a trump card against every RFRA claim." *Id.* at 939. By the same token, however, Plaintiffs cannot claim that, regardless of fact or circumstance, they will always prevail under RFRA.

Finally, as to least restrictive means, the Supreme Court has indicated that application of the least restrictive means test requires a fact-specific analysis. *O Centro*, 546 U.S. at 430. Therefore, this test cannot be applied to a blanket, pre-enforcement basis to the numerous unnamed members of an organization, or to unknown future members of an organization. Plaintiffs' inability to demonstrate a violation of RFRA is underscored by the fact that both agencies have demonstrated a commitment to applying RFRA's test, and there are no examples of either agency ever bringing enforcement actions in order to require an entity anyone to perform or provide insurance coverage for gender-affirming care, fertility treatments, or abortion in violation of RFRA.

**III.    The Court Should Limit Any Relief to Current CBA Members.**

Although the Court should dismiss Plaintiffs' RFRA claims or, in the alternative, enter judgment in Defendants' favor for the reasons explained above, to the extent the Court grants any relief, it should limit such relief to CBA's current members. The Supreme Court has "recognized that an association has standing to bring suit *on behalf of its members*" when the three-part test for associational standing is satisfied. *Hunt*, 432 U.S. at 343 (emphasis added). But the Supreme Court has never recognized an association's standing to bring suit on behalf of someone who *is not a member* of the organization, based on the circumstance that the person or entity may become a member in the future. Thus, even if the Court were to determine that CBA has met the three-part test for associational standing as to current members, the Court should not extend Article III standing beyond what has been recognized by the Supreme Court.

Traditional equitable principles further counsel against extending relief to future members. "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 585 U.S. 48, 73 (2018), and "injunctive relief should be no more burdensome to the defendant than

necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 765 (1994). Plaintiffs are CBA and three of its members. Granting relief to entities that are not CBA members is unnecessary to provide complete relief.

At a minimum, even if the Court were to extend relief to future members, it should not apply relief to any person or entity who is not a member of CBA at the time of any alleged violation of Title VII or Section 1557. A rule that allowed an entity to join CBA and later take advantage of any relief awarded in this case (such as during the investigation, during litigation, or on the eve of trial) would be open to manipulation.[10]

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion and grant Defendants' motion to dismiss or, in the alternative, cross-motion for summary judgment on Plaintiffs' RFRA claims.

Dated: September 11, 2024          Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

DIANE KELLEHER
Director, Federal Programs Branch

MICHELLE BENNETT
Assistant Director, Federal Programs Branch

 */s/ Bradley P. Humphreys*
BRADLEY P. HUMPHREYS
(D.C. Bar No. 988057)
Senior Trial Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005

---

[10] Such an entity could, of course, raise its own defenses under RFRA, independent of this litigation.

39

(202) 305-0878
Bradley.Humphreys@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that, on September 11, 2024, I electronically filed a copy of the foregoing.

Notice of this filing will be sent via email to all parties by operation of the Court's CM/ECF

system. Parties may access this filing through the CM/ECF system.

*/s Bradley P. Humphreys*
BRADLEY P. HUMPHREYS