IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION

| | | |
|---|---|---|
| Catholic Benefits Association, et al., | ) | |
| | ) | **ORDER** |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 3:23-cv-203 |
| | ) | |
| Robert Kennedy, Jr., Secretary of the United States Department of Health and Human Services, et al., | ) ) ) ) ) | |
| Defendants. | ) | |

Members of the Catholic Benefits Association ("CBA") are Catholic employers that "provide health or other benefits to their respective employees in a manner that is consistent with Catholic values." Doc. 46, ¶ 45. Those Catholic values, says the CBA, are unduly burdened by a regulation promulgated by the Department of Health and Human Services ("HHS") in May 2024.[1] Four years ago, this Court found a similar regulation was a violation of the Religious Freedom Restoration Act ("RFRA") as applied to the CBA. But the Eighth Circuit determined the CBA lacked associational standing because it did not identify an injured member. In this case, the CBA remedies its error and moves for summary judgment and an injunction similar to one issued four years ago.

**I.    BACKGROUND**

The CBA is an organization with thousands of members, and one of those members is St. Anne's Guest Home. See id. ¶ 24. Established in the 1940s to serve the homeless and the indigent,

---

[1] Under Federal Rule of Civil Procedure 25(d), the Clerk is directed substitute Secretary of Health and Human Services Robert F. Kennedy for Xavier Becerra and substitute Chair of the Equal Employment Opportunity Commission Andrea Lucas for Charlotte Burrows.

St. Anne's in Grand Forks, North Dakota, is a health care facility that provides senior residences to low-income individuals and couples, and those who can live independently with care. Id. ¶ 25. Its Catholic ministry is inspired by St. Francis of Assisi; the Sisters of St. Francis live next door, working with the staff and residents every day, around the clock. St. Anne's strives to "serve each person who comes to us as [they] would Christ" and meet the "spiritual and physical" needs of the people it serves. Id. ¶¶ 28-30.

St. Anne's is also a healthcare employer that receives funding from Medicaid. Id. ¶ 31. This subjects St. Anne's to certain federal statutes: first, as a health care facility that receives federal funds, St. Anne's is a "health program or activity" for purposes of the Affordable Care Act.[2] See 45 C.F.R. § 92.4. Section 1557 of that Act prohibits discrimination on grounds prohibited in other federal civil rights statutes, including Title IX's prohibition of discrimination "on the basis of sex." See 42 U.S.C. § 18116. Second, as an employer of more than fifteen people, St. Anne's is subject to Title VII of the Civil Rights Act. That Act is enforced by the Equal Employment Opportunity Commission ("EEOC") and, among other things, prohibits employers from discriminating against someone "because of . . . sex." 42 U.S.C. § 2000e-2(a).

The Government's interpretation and enforcement of Section 1557's prohibition on sex discrimination has been fraught. Two presidential administrations published a final rule interpreting that statutory language—one in 2016 and another in 2020—and both were subsequently enjoined or vacated by federal courts for different reasons. A third presidential

---

[2] A "health programs or activity" is any project, venture, or undertaking to, among other things, "[p]rovide or administer health-related services, health insurance coverage, or other health-related coverage" or "[p]rovide health education for health care professionals or others." See 45 C.F.R. § 92.4. The Government does not dispute that St. Anne's and other similar CBA members are health programs or activities as the term is defined in federal regulation.

administration attempted its own rule—the one challenged here—but its implementation has also been delayed by courts. Still, St. Anne's, along with thousands of other Catholic organizations represented by the CBA, are concerned the 2024 Rule requires them to provide and cover treatments they consider immoral, and they fear a refusal to compromise their faith will be met with a loss of federal funds, and other liability.

### A. The 2016 Rule, the 2020 Rule, and Religious Sisters

Though the complaint in this case was filed in 2023, the dispute began nine years earlier. In 2016, HHS promulgated a final rule that interpreted Section 1557's prohibition of discrimination "on the basis of sex" to include discrimination on the basis of "gender identity." Religious Sisters, 513 F. Supp. 3d at 1124 (citing Nondiscrimination in Health Programs and Activities, 81 FR 31375-01 (May 18, 2016)). "Gender identity" is a person's "sense of being male, female, or something else, which may or may not correspond to an individual's sex assigned at birth." Bostock v. Clayton County, 590 U.S. 644, 686, n.6 (2020) (citation omitted) (Alito, J., dissenting). Someone whose gender identity differs from their sex assigned at birth is generally considered transgender. Id.

A prohibition of discrimination on the basis of gender identity meant a health program could not refuse to "offer medical services for gender transitions if that provider offered comparable services to others." Religious Sisters, 513 F. Supp. 3d at 1124. To use an example from HHS, "A provider specializing in gynecological services that previously declined to provide a medically necessary hysterectomy for a transgender man would have to revise its policy to provide the procedure for transgender individuals in the same manner it provides the procedure for other individuals." Id. Likewise, an employer could be liable for sex discrimination under Title

VII if its group health plan did not cover "gender-transition procedures."[3] See id. at 1126. The State of North Dakota, the Religious Sisters of Mercy, and the CBA, among others, sued HHS and EEOC, but another court enjoined the 2016 Rule's enforcement, and the litigation was stayed pending HHS's reconsideration of the rule. Id. at 1127-28.

In 2020, HHS promulgated a second rule—the 2020 Rule—that repealed its interpretation of discrimination on the basis of sex as including discrimination on the basis of gender identity, but otherwise left "on the basis of sex" undefined. Id. at 1129 (citing Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority, 85 FR 37160-01 (June 19, 2024)). It also incorporated religious exemptions left out of the 2016 Rule. Id.

But after the Supreme Court found in Bostock, 590 U.S. at 660, that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex," two federal district courts enjoined HHS from enforcing parts of the 2020 Rule. One court held the definitions of "on the basis of sex" and "gender identity" would "remain in effect." See Walker v. Azar, 480 F. Supp. 3d 417, 430 (E.D.N.Y. 2020). Another court enjoined HHS's repeal of the 2016 Rule's interpretation that discrimination "[o]n the basis of sex" included discrimination on the basis of sex-stereotypes. That court also enjoined HHS from enforcing the 2020 Rule's incorporation of certain religious exemptions. See Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs., 485 F. Supp. 3d 1 (D.D.C. 2020).

This was the state of affairs when the stay in Religious Sisters was lifted at the parties' request in November 2020. In January 2021, the CBA and other Catholic organizations' motions for summary judgment on their claims under the Religious Freedom Restoration Act (RFRA) were

---

[3] In this order, "the term 'gender-transition procedures' includes surgery, counseling, provision of pharmaceuticals, or other treatments sought in furtherance of a gender transition." Religious Sisters, 513 F. Supp. 3d at 1154.

granted in part. The plaintiffs, including the CBA, sought prospective relief, which meant they had to show an "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and . . . a credible threat of prosecution." Babbitt v. United Farm Workers Nat. Union, 442 U.S. 289, 298 (1979). This Court found, among other things, HHS and EEOC had vowed to enforce their sex discrimination prohibitions, and the Bostock decision and the injunctions against the 2020 Rule presented "a renewed threat" of liability. See Religious Sisters, 513 F. Supp. 3d at 1139.

Turning to the merits, this Court found "the prevailing interpretations of Section 1557 and Title VII" required the CBA's members "to perform or cover gender-transition procedures" or lose federal funding and face civil liability. Id. at 1147. Under the RFRA, the CBA's members' exercise of religion was substantially burdened, the Government could not demonstrate its policy was the least restrictive means available, and so its interpretation and application of Section 1557 and Title VII "violate[d] [the CBA's] sincerely held religious beliefs without satisfying strict scrutiny under the RFRA." Id. at 1153. As a remedy, the Government was enjoined from interpreting or enforcing Section 1557 and Title VII against the CBA's members and other Catholic organizations "in a manner that would require them to perform or provide insurance coverage for gender-transition procedures." Id.

The Government appealed, and the Eighth Circuit affirmed with a caveat: the CBA could not sue on behalf of its unnamed members because it failed to identify "particular members and their injuries." Religious Sisters, 55 F.4th at 601. On remand, this Court denied the CBA's request to reopen the record and removed its unnamed members from the injunction. In denying the CBA's motion, the Court reminded the parties "nothing prevent[ed] the CBA from filing a new action, where associational standing is properly established." Religious Sisters, 3:16-cv-386, Doc. 169.

The CBA filed this case to establish associational standing, and the claims were identical to those in Religious Sisters, but events intervened. In May 2024, the HHS promulgated a new, final rule—the 2024 Rule—that unsettled the state of affairs upon which the Religious Sisters injunction had been granted.

**B.     The 2024 Rule**

In 2024, HHS published its latest interpretation of Section 1557. See Nondiscrimination in Health Programs and Activities, 89 FR 37522-01 (May 6, 2024). In the 2024 Rule, HHS interpreted Section 1557 in several important ways. First, and most importantly, it again interpreted Section 1557's incorporation of Title IX's prohibition of discrimination "on the basis of sex" to include discrimination on the basis of gender identity. See 45 C.F.R. § 92.101(a)(iv). The prohibition of discrimination on the basis of gender identity means health programs could not prohibit certain treatments to individuals on that basis, which, as mentioned above, effectively requires those health programs to perform and cover gender-transition procedures. See Religious Sisters, 513 F. Supp. 3d at 1124 (providing example).

Second, the 2024 Rule interpreted discrimination on the basis of sex to include discrimination on the basis of "pregnancy or related conditions." 45 C.F.R. § 92.101(ii). The codified regulation includes only "pregnancy or related conditions" and not "termination of pregnancy" as the 2016 Rule did.[4] See id. That said, HHS explained in response to a public comment that it agreed "that protections afforded for pregnancy or related conditions include termination of pregnancy" but declined to include it in the codified regulation. See Nondiscrimination in Health Programs and Activities, 89 FR 37522-01, 37577 (May 6, 2024).

---

[4] The 2016 Rule, formerly codified at 45 C.F.R. § 92.4, stated "[o]n the basis of sex includes . . . termination of pregnancy."

HHS stressed that a decision "not to provide abortions does not itself constitute discrimination in violation of section 1557." Id. Likewise, a "willingness or refusal to provide, pay for, cover, or refer for abortion or to provide or participate in training to provide abortion also is not discrimination under section 1557." Id. Rather, HHS stated, a prohibition of discrimination on the basis of termination of pregnancy means a health program cannot deny "unrelated medical care" to a woman "solely on the fact they had a prior abortion." Id.

Third, the 2024 Rule established a "case-by-case" adjudication process for religious organizations that rely on federal protections for religious freedom and conscience. See 45 C.F.R. § 92.302. A health program may seek a religious exemption at any time and receive a response from HHS. If the health program invokes a religious exemption during an investigation into a complaint of discrimination, HHS will resolve the applicability of the exemption before proceeding any further on the complaint. Id. § 92.302(c)(1)-(2). And if HHS determines the health program's reliance on a religious exemption is erroneous, the agency will not seek backward looking relief. Id. § 92.302(c)(1)-(2). Denial of a religious exemption is subject to judicial review after an internal appeals process. See 45 C.F.R. § 92.302; see also 45 C.F.R. § 81.104.

### C. This Case

The CBA argues the 2024 Rule, like the status quo during the Religious Sisters litigation, mandates its members "cover or provide gender-affirming care, abortion, and immoral infertility treatments." Doc. 46, p. 8. Its complaint has fifteen counts, but most of those claims are stayed while the parties litigate the claims under the RFRA. The CBA's arguments that application of the 2024 Rule against its members violates the RFRA is similar to the arguments it made in Religious Sisters, and this Court acknowledged in May 2024 that, had nothing changed between 2021 and now, the CBA was likely to succeed on the merits. See Doc. 45. But the 2024 Rule changed the status quo, and "the legal landscape . . . shifted." See e.g., Franciscan All., Inc. v. Becerra, 843 F.

7

App'x 662 (5th Cir. 2021) (remanding for further proceedings after intervening agency action). So, after the 2024 Rule was published, the CBA filed an amended complaint, and the parties' renewed their motions.

## II. LAW AND DISCUSSION

The Government moves to dismiss the CBA's claims under Rule 12(b)(2) and Rule 56(a) because the CBA lacks standing, and its claims are unripe. The CBA moves for summary judgment on its claims under the RFRA. Summary judgment is required "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. Civ. P. 56(a). Together, the parties' motion presents two issues: the CBA's standing, and the merits of its claims under the RFRA.

### A. Standing

Article III of the United States Constitution limits the subject matter jurisdiction of federal courts to "cases" and "controversies," and this jurisdictional limitation requires every plaintiff to demonstrate it has "standing" when bringing an action in federal court. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

The CBA is an association of employers—it is not subject to the 2024 Rule itself—so it seeks to sue on behalf of its members. And associational standing permits an organization like the CBA to "bring suit on behalf of its members" in a representational capacity. See Hunt v. Washington State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977). To proceed in this way, the CBA must show that (1) "the interests it seeks to protect are germane to the organization's purpose," (2) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit," and (3) "its members would otherwise have standing to sue in their own right." Id.

That last element requires CBA make "specific allegations establishing that at least one identified member had suffered or would suffer harm." Summers, 555 U.S. at 498. In Religious Sisters, the CBA failed to make those specific allegations according to the Eighth Circuit, but its amended complaint remedies that failure through the identification of injured members. See Doc. 46, ¶¶ 13-44 (identifying the Sisters of St. Francis, St. Anne's Guest House, and St. Gerard's Community of Care); see also Docs. 46-5, 46-6, 46-7, 46-8 (declarations from leadership from several Catholic health programs and activities).

The CBA's "identified member" that would have "standing to in their own right" must meet the traditional elements of standing. Lujan, 504 U.S. at 560. This requires the identified member suffer "an injury in fact" that is "concrete and particularized" and "actual and imminent." Id. (cleaned up). If the injury is not actual but anticipated—as in a pre-enforcement challenge like this one—the identified member must show "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 159 (2014). Second, "there must be a causal connection between the injury and the . . . challenged action of the defendant." Id. And third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Id.

First, the CBA has identified its members that would standing in their own right. The CBA attached declarations from four of its members that state how the Government's enforcement of Section 1557 and Title VII would harm them. Chris Baechle, the Chief Executive Officer of Cardinal Ritter Senior Services, a Catholic nonprofit providing elder care that receives federal funds, stated in a declaration that requiring Cardinal Ritter Senior Services to cover gender-transition procedures in its health plan would violate the organization's "deeply-held Catholic

values." Doc. 46-5. Likewise, Dr. Michael Sherman, the executive director of the Holy Family Catholic Clinic, stated in a declaration that requiring it to perform gender-transition procedures would violate the "Catholic convictions of the Holy Family Catholic Clinic." Doc. 46-6. Dr. Michelle Stanford, owner of Centennial Pediatrics, a medical provider whose patients sometimes "report symptoms consistent with gender dysphoria," also stated providing gender-transition treatment would violate the organization's Catholic values. Doc. 46-7. Lastly, Anthony Tennes, Chairman of Catholic Charities North Dakota, stated that a requirement to insure or facilitate access to gender-transition procedures would result in "severe, ongoing, and irreparable" harm to Catholic Charities North Dakota.[5] Doc. 46-8.

And the Government posed a credible threat of enforcement when the complaint was filed, meaning the CBA's identified members suffered an injury. There was a credible threat enforcement in Religious Sisters based on the legal status quo, which included Bostock and the injunctions against the 2020 Rule. See 513 F. Supp. 3d at 1139-40. Here, the CBA's amended complaint was filed in May 2024, and standing is assessed "at the time the action commences." L.H. v. Indep. Sch. Dist., 111 F.4th 886, 892 (8th Cir. 2024). In May 2024, the Government had reaffirmed it would "interpret and enforce" Section 1557's sex discrimination prohibition to include "discrimination on the basis of gender identity." Notification of Interpretation and Enforcement of Section 1557 of the Affordable Care Act and Title IX of the Education Amendments of 1972, 86 FR 27984-02 (May 2021).

---

[5] This Court previously found Section 1557 did not apply to certain CBA members because those members did not receive federal funds. See Religious Sisters, 513 F. Supp. 3d at 1136. In this case, the CBA's declarations identify members that receive federal funds and have more than fifteen employees, which subjects those members to Section 1557 and Title VII.

A lot has happened since the amended complaint was filed, to be sure. In July 2024, for example, the Southern District of Mississippi stayed the 2024 Rule's extension of "discrimination on the basis of sex to include discrimination on the basis of gender identity." Tennessee v. Becerra, 739 F. Supp. 3d 467, 486 (S.D. Miss. 2024). It also preliminarily enjoined the HHS from "enforcing, relying on, implementing, or otherwise acting pursuant to the May 2024 Rule's provisions concerning gender identity." Id.

The loss of a controversy after the complaint is filed is called mootness, and "a case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Already, LLC v. Nike, Inc., 568 U.S. 85, 91 (2013). But nationwide relief in another proceeding does not usually moot other cases seeking the same relief. See State of Fla. v. Dep't of Health & Hum. Servs., 19 F.4th 1271, 1280 (11th Cir. 2021); see also California v. U.S. Dep't of Health & Hum. Servs., 941 F.3d 410, 423 (9th Cir. 2019). The nationwide relief granted by the Southern District of Mississippi is limited in duration; it is only preliminary. A possibility that it may expire means the defendants' conduct, even if currently enjoined, is "capable of repetition yet evading review," one of the exceptions to mootness. See State of Florida, 19 F.4th at 1280-82; see also California, 941 F.3d at 423.

The CBA has identified members that faced a credible threat of enforcement when the amended complaint was filed. So, the CBA has remedied its failure from Religious Sisters by identifying particular members that could bring claims of their own and has met the first requirement of associational standing.

Two requirements are left for the CBA to establish associational standing—that the interest the CBA seeks to protect are "germane to [its] purpose" and "neither the claim asserted nor the

relief requested requires the participation of individual members in the lawsuit." See Northland Parent Ass'n, 571 F. Supp. 3d at 1113. This Court previously found the CBA satisfied both requirements, but the Government states there are reasons to doubt that individual participation is not required. See Doc. 55, p. 35.

The Government argues the CBA cannot bring a RFRA claim on behalf of its members because that statute requires fact-specific, 'to-the-person' considerations. Id. Indeed, for some claims individual participation may be "indispensable to proper resolution." See Warth, 422 U.S at 511. In Harris v. McRae, for example, the Supreme Court held an association could not bring a Free Exercise claim on behalf of its members because the association conceded there was a "diversity of views" within its membership and whether an individual's exercise of religion was burdened was "ultimately and absolutely entrusted to the conscience of the individual." 448 U.S. 297, 321 (1980). But that lack of uniformity is not an issue with the CBA, whose Catholic members share the same beliefs regarding gender-transition procedures. See Doc. 46, ¶ 45. "Because the CBA's members are so uniform in their beliefs . . . the CBA can properly present its members' claims in this case such that the participation of the individual members of the CBA is not required." Cath. Benefits Ass'n LCA v. Sebelius, 24 F. Supp. 3d 1094, 1101 (W.D. Okla. 2014).

The CBA has established its associational standing and may bring a claim under the RFRA on behalf of its members. The CBA alleges the 2024 Rule violates the RFRA because it mandates them to provide gender-transition procedures, abortions, and fertility treatments its members consider immoral. The 2024 Rule addresses these matters separately, so each of the CBA's alleged mandates—gender-transition procedures, abortion, and fertility treatments—will be considered separately too.

### B. Religious Freedom Restoration Act

Passed in 1992, Congress enacted the RFRA "to provide very broad protection for religious liberty." Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682, 693 (2014). The RFRA forbids the federal government from "substantially burden[ing] a person's exercise of religion" unless the burden (1) "is in furtherance of a compelling governmental interest" and (2) "is the least restrictive means of furthering that compelling interest." 42 U.S.C. § 2000bb-1(b). The RFRA operates "as a kind of super statute, displacing the normal operation of other federal laws." Bostock, 590 U.S. at 68.

#### i. Gender Identity

Four years ago, this Court found the Government's interpretation and application of Section 1557 as prohibiting gender identity discrimination was a violation of the RFRA as applied to the CBA and other Catholic organizations because there was a mandate to "perform and provide insurance coverage for gender-transition procedures." See Religious Sisters, 513 F. Supp. 3d at 1153. An injunction was granted, and the Eighth Circuit largely affirmed on appeal. See Religious Sisters, 55 F.4th at 609. The 2024 Rule adopts that same interpretation of Section 1557, but the Government argues the same result—a violation of the RFRA—does not occur because of a new case-by-case procedure for religious exemptions in the 2024 Rule. See Doc. 55, p. 24. In other words, the 2024 Rule's interpretation of discrimination on the basis of sex to include discrimination on the basis of gender identity "substantially burdens" the CBA's members' exercise of religion. See Religious Sisters of Mercy, 513 F. Supp. 3d at 1147. Assuming a compelling interest, the only question under the RFRA, then, is whether the 2024 Rule's case-by-case-procedure is "the least restrictive means" available. Id. at 1148.

"To satisfy the least-restrictive-means test, the government must come forward with evidence to show that its policies "are the only feasible means . . . to achieve its compelling interest." Id. (internal quotation mark and citation omitted). Courts have found similar case-by-case exemption procedures insufficient to ease the burden on religious organizations. See Cath. Benefits Ass'n v. Burrows, 732 F. Supp. 3d 1014, 1027 (D.N.D. 2024) ("The Agency argues the case-by-case standard is a lawful option; however, even if that is true, that does not make it the least restrictive means."); see also Stanley M. Herzog Foundation v. EEOC, 4:24-cv-651, Doc. 55, p. 18 (W.D. MO March 18, 2025) (finding the same). See Christian Emps. All. v. United States Equal Opportunity Comm'n, No. 1:21-CV-195, 2022 WL 1573689, at *8 (D.N.D. May 16, 2022) (finding the same). The case-by-case exemption procedure leaves religious organizations unable to predict their legal exposure without furthering any compelling antidiscrimination interests. See e.g., Religious Sisters of Mercy, 513 F. Supp. 3d at 1149.

The CBA was removed from the injunction in Religious Sisters because the Eighth Circuit found it lacked associational standing. 55 F.4th at 602. The CBA has remedied that error. Through declarations, the CBA has identified injured members that, at the time the complaint was filed, faced a credible threat of liability and enforcement for not complying with the Government's interpretation and application of the 2024 Rule. So, it can challenge those provisions on behalf of its members. The CBA has succeeded on the merits of its claims under the RFRA once before, and it does so again. For those reasons, the CBA's motion for summary judgment on its claims under the RFRA are granted with respect to the 2024 Rule's interpretation and enforcement of gender identity in 45 C.F.R. § 92.101(a)(iv).

### ii. Abortion and Fertility Treatments

In this case, like in Religious Sisters, "[t]he parties have often treated the abortion-related claims as an afterthought." 513 F. Supp. 3d at 1135. In Religious Sisters, the plaintiffs' abortion-related claims were denied because, at the time, "termination of pregnancy" had been removed from the final rule, HHS had incorporated Title IX's abortion-neutrality exemption, and there were several overriding religious freedom and conscience laws that protect against the compulsory provision of abortions. See Religious Sisters, 513 F. Supp. 3d at 1135.

Some of those circumstances are still present, and some have changed. The 2024 Rule did not include "termination of pregnancy" in the codified regulation like the 2016 Rule did, though HHS said it interpreted "pregnancy or related conditions" to include "termination of pregnancy." See 45 C.F.R. § 92.101(a)(2)(ii); see also Nondiscrimination in Health Programs and Activities, 89 FR 37522-01, 37576 (May 6, 2024) ("While we agree that protections afforded for pregnancy or related conditions include termination of pregnancy, [the Office of Civil Rights] declines to revise the language at § 92.101(a)(2) to include or exclude specific examples and will interpret section 1557's protections on the basis of sex consistent with applicable case law addressing discrimination on the basis of sex, including pregnancy or related conditions."). The 2024 Rule likewise does not incorporate Title IX's abortion exception but overriding religious freedom and conscience statutes still apply.[6]

---

[6] These statutes were summarized in Religious Sisters: "The Weldon Amendment . . . prevents federal agencies from discriminating against healthcare entities based on (identical to Section 1303) refusal to provide, pay for, provide coverage of, or refer for abortions. See Consolidated Appropriations Act of 2019, Pub. L. No. 115-245, Div. B, § 507(d)(1), 132 Stat. 2981, 3118 (2018). The Coats-Snowe Amendment prohibits the federal government from discriminating against healthcare entities that decline to perform, refer for, or undergo training for abortions. 42 U.S.C. § 238n(a)(1). And the Church Amendments guarantee that a recipient of certain sources of federal funds cannot be compelled to perform or assist in sterilization procedures or abortions if

The CBA's motion for summary judgment relies on the reasoning of Religious Sisters, but the abortion-related claims were dismissed in that case. So, the Court cannot transplant the reasoning there to HHS's interpretation and application of "pregnancy and other conditions" here. Nor does the CBA's brief in support of summary judgment provide additional reasoning. See Doc. 51, p. 30 (arguing judgment should be entered "for the reasons previously stated" in Religious Sisters). And it is unclear whether the text of § 92.101(a)(2)(ii) impacts the CBA's members in the manner alleged. See Nondiscrimination in Health Programs and Activities, 89 FR 37522-01, 37576 (May 6, 2024) ("[A] covered provider's decision not to provide abortions does not itself constitute discrimination in violation of section 1557. Also, a covered provider's willingness or refusal to provide, pay for, cover, or refer for abortion or to provide or participate in training to provide abortion also is not discrimination under section 1557.").

To the extent the HHS's interpretation and enforcement of the 2024 Rule's use of "pregnancy and other conditions" in § 92.101(a)(2)(ii) conflicts with CBA members' religious values, the CBA's claims are unripe and underdeveloped. The CBA's motion for summary judgment is denied, and the Government's motion to dismiss is granted with respect to this aspect of its claims under the RFRA. See Nebraska Pub. Power Dist. v. MidAmerican Energy Co., 234 F.3d 1032, 1038 (8th Cir. 2000) (ripeness "safeguards against judicial review of hypothetical or speculative disagreements.").

The same is true for the CBA's claim regarding fertility treatments its members consider immoral. The CBA's motion for summary judgment calls for an application of the reasoning in Religion Sisters, but fertility treatments were not addressed in that case. There are various federal

---

'contrary to [the recipient's] religious beliefs or moral objections.' 42 U.S.C. § 300a-7(b)(1)." 513 F. Supp. 3d at 1125.

statutes and regulations regarding fertility treatments, contraceptives, and religious organizations, and these issues are largely unbriefed and underdeveloped. For that reason, the CBA's motion for summary judgment is denied, and the Government's motion to dismiss is granted with respect to this aspect of the claim under the RFRA. See Nebraska Pub. Power Dist, 234 F.3d at 1038.

### III.     SCOPE OF RELIEF

The CBA's motion for summary judgment on its claims under the RFRA is granted with respect to the 2024 Rule's extension of discrimination on the basis of sex to discrimination on the basis of gender identity. So, the only remaining matter is whether the injunction should protect future CBA members. Whether injunctive relief to an associational plaintiff—that is, an uninjured organization proceeding on behalf of its injured members—should apply to future members of that association is an open question. See Ass'n of Am. Physicians & Surgeons v. United States Food & Drug Admin., 13 F.4th 531, 541 (6th Cir. 2021) ("Should an injunction . . . . apply only to existing members on the date of the judgment? Or should it cover future members—seemingly allowing an organization to advertise the injunction in its marketing materials?").

Associational standing's grant of non-party relief is a departure from the Supreme Court's recent emphasis that remedies "ordinarily 'operate with respect to specific parties.'" California v. Texas, 141 S. Ct. 2104, 2115 (2021) (quoting Murphy v. Nat'l Collegiate Athletic Ass'n, 584 U.S. 453, 489 (2018) (Thomas J., concurring); United States v. Texas, 599 U.S. 670, 693 (2023) (Gorsuch, J., concurring) ("Traditionally, when a federal court finds a remedy merited, it provides party-specific relief, directing the defendant to take or not take some action relative to the plaintiff."). This departure from party-specific relief is permissible because the association must show its non-party, injured members could bring claims of their own, and so the association should not ordinarily be granted "broader relief than its members could have received had they sued in

17

their own right." Michael T. Morley, <u>Disaggregating Nationwide Injunctions</u>, 71 Ala. L. Rev. 1, 25-26 (2019). Granting relief to the CBA's future members would do just that: it would grant relief broader than if CBA's existing members had proceeded on their own and stray too far from the principle of party-specific relief.

## IV.   CONCLUSION

The CBA's motion for summary judgment (Doc. 50) is **GRANTED IN PART AND DENIED IN PART**. The Government's motion to dismiss (Doc. 56) is **DENIED**, but its motion for summary judgment in the alternative (Doc. 58) is **GRANTED IN PART AND DENIED IN PART**. The CBA's motion for summary judgment is granted with respect to the enforcement of the 2024 Rule's prohibition of discrimination on the basis of gender identity as applied to the CBA's members. The CBA's motion is denied with respect to its claims regarding abortion and fertility treatment its members consider immoral. Because of the extensive briefing, the CBA's motion for a hearing (Doc. 65) is **DENIED**.

The Court **DECLARES** that HHS's interpretation of Section 1557 that requires the CBA's members to perform and provide insurance coverage for gender-transition procedures violates their sincerely held religious beliefs without satisfying strict scrutiny under the RFRA. The Court **PERMANENTLY ENJOINS AND RESTRAINS** HHS, Secretary Kennedy, their divisions, bureaus, agents, officers, commissioners, employees, and anyone acting in concert or participation with them, including their successors in office, from interpreting or enforcing Section 1557 of the ACA, 42 U.S.C. § 18116(a), or any implementing regulations thereto against the CBA and its current members in a manner that would require them to perform or provide insurance coverage for gender-transition procedures, including by denying federal financial assistance because of their failure to perform or provide insurance coverage for such procedures or by otherwise pursuing,

charging, or assessing any penalties, fines, assessments, investigations, or other enforcement actions.

The Court further **DECLARES** that the EEOC's interpretation of Title VII that requires the CBA and its members to provide insurance coverage for gender-transition procedures violates their sincerely held religious beliefs without satisfying strict scrutiny under the RFRA. The Court **PERMANENTLY ENJOINS AND RESTRAINS** the EEOC, Chair Lucas, their divisions, bureaus, agents, officers, commissioners, employees, and anyone acting in concert or participation with them, including their successors in office, from interpreting or enforcing Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., or any implementing regulations thereto against the CBA and its current members in a manner that would require them to provide insurance coverage for gender-transition procedures, including by denying federal financial assistance because of their failure to provide insurance coverage for such procedures or by otherwise pursuing, charging, or assessing any penalties, fines, assessments, investigations, or other enforcement actions.

**IT IS SO ORDERED**.

Dated this 5th day of June, 2025.

*/s/ Peter D. Welte*
Peter D. Welte, Chief Judge
United States District Court